Judge STRAUB dissents in a separate opinion.
B.D. PARKER, JR., Circuit Judge:
Defendants-Appellants the U.S. Agency for International Development (“USAID”), the U.S. Department of Health and Human Services (“HHS”), and the U.S. Centers for Disease Control and Prevention (“CDC”) (collectively, the “Agencies” or “Defendants”) appeal from preliminary injunctions entered by the United States District Court for the Southern District of New York (Marrero, /.). The district court enjoined the Agencies from enforcing 22 U.S.C. § 7631(f), a provision of the United States Leadership Against HIV/ AIDS, Tuberculosis, and Malaria Act of 2003 (“Leadership Act”), 22 U.S.C. § 7601 et seq., against Plaintiffs-Appellees Alliance for Open Society International, Inc. (“AOSI”), Pathfinder International (“Pathfinder”), Global Health Council (“GHC”), and InterAetion. These are non-governmental organizations (“NGOs”) engaged in the international fight against HIV/AIDS that receive funding under the Act.
Section 7631(f) of the Leadership Act provides that “[n]o funds made available to carry out this Act ... may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution.” This provision, as construed and implemented by the Agencies, requires NGOs, as a condition of receiving Leadership Act funds, to adopt a policy explicitly opposing prostitution, and prohibits recipients from engaging in any activities that are “inconsistent” with an anti-prostitution stance. Certain other recipients of Leadership Act funds, such as the World Health Organization, are not bound by this restriction.
As explained below, we conclude that § 7631(f), as implemented by the Agencies, falls well beyond what the Supreme Court and this Court have upheld as permissible conditions on the receipt of government funds. Section 7631(f) does not merely require recipients of Leadership Act funds to refrain from certain conduct, but goes substantially further and compels recipients to espouse the government’s viewpoint. See 45 C.F.R. § 89.1. Consequently, we agree with the district court that Plaintiffs have demonstrated a likelihood of success on the merits. Finding no *224 abuse of discretion by the district court, we affirm.
BACKGROUND
The Leadership Act
In 2003, Congress passed the Leadership Act “to strengthen and enhance United States leadership and the effectiveness of the United States response to the HIV/ AIDS, tuberculosis, and malaria pandemics.” 22 U.S.C. § 7603 (Supp. Ill 2009).[1] The Act designates several avenues through which this international campaign is to be run, including “5-year, global strategies”; the development of vaccines and treatments; and “public-private” partnerships between federal agencies and NGOs, which Congress recognized “have proven effective in combating the HIV/ AIDS pandemic.” §§ 7601(18), 7603.
The Act reflects Congress’s concern with the social, cultural, and behavioral causes of HIV/AIDS. See § 7601(15). Section 7601(23), one of forty-one congressional “findings” set forth in § 7601, addresses prostitution: “Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices. The sex industry, the trafficking of individuals into such industry, and sexual violence are additional causes of and factors in the spread of the HIV/ AIDS epidemic.”
Congress imposed two prostitution-related conditions on Leadership Act funding. First, it specified that no funds made available to carry out the Act may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. § 7631(e). Second, it imposed a Policy Requirement, which specifies that:
No funds made available to carry out this Act ... may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except that this subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.
§ 7631(f). This litigation involves only the Policy Requirement. Plaintiffs do not challenge the Requirement’s “sex trafficking” component.
Defendants’ Initial Implementation of the Policy Requirement
The defendant Agencies implement the Leadership Act by, in part, funding U.S.based NGOs involved in the international fight against HIV/AIDS. AOSI and Pathfinder are two such organizations. AOSI runs a program in Central Asia that aims to prevent the spread of HIV/AIDS by reducing injection drug use, while Pathfinder works to stem the spread of HIV/ AIDS by providing family planning and reproductive health services in more than twenty countries. Both receive funding from sources other than the Agencies and neither supports prostitution. But their work does involve engaging, educating, and assisting groups, such as prostitutes, that are vulnerable to HIV/AIDS, as well as advocating approaches and discussing strategies for fighting HIV/AIDS among prostitutes at, among other places, policy conferences and forums.
*225 After the Leadership Act was enacted, the Department of Justice’s Office of Legal Counsel (“OLC”) warned that applying the Policy Requirement to U.S.-based organizations would be unconstitutional. Heeding that warning, Defendants initially refrained from enforcing it against U.S.based NGOs. OLC subsequently changed course and withdrew what it characterized as its prior “tentative advice,” asserting that “there are reasonable arguments to support the[ ] constitutionality” of applying the Policy Requirement to U.S.-based organizations, and, starting in mid-2005, the Agencies began applying the Requirement to U.S.-based grantees. Specifically, USAID issued a directive requiring that U.S.-based organizations, as a condition of receiving funding under the Act, “must have a policy explicitly opposing prostitution.” Defendants also construed the Policy Requirement as prohibiting grantees from engaging in activities that were inconsistent with a policy opposing prostitution. In an effort to remain eligible for Leadership Act funding, both AOSI and Pathfinder adopted policy statements. Pathfinder’s, for example, stated that it “opposes prostitution and sex trafficking because of the harm they cause primarily to women.”
The District Court’s First Decision
In 2005, AOSI and Pathfinder sued the Agencies, contending that conditioning Leadership Act funding on the affirmative adoption of a policy opposing prostitution violated the First Amendment by compelling grantees to adopt and voice the government’s viewpoint on prostitution, and by restricting grantees from engaging in privately funded expression that the Agencies might deem insufficiently opposed to prostitution. They also asserted that the Policy Requirement was unconstitutionally vague with respect to what sorts of prostitution-related activity and expression were, in fact, restricted.
The district court granted AOSI and Pathfinder preliminary injunctive relief. Alliance for Open Soc’y Int’l, Inc. v. U.S. Agency for Int’l Dev., 430 F.Supp.2d 222 (S.D.N.Y.2006) (“Alliance I”). The court engaged in a thorough analysis of the Supreme Court’s “unconstitutional conditions” jurisprudence — focusing, in particular, on Regan v. Taxation With Representation, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), FCC v. League of Women Voters of California, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), and Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The court first concluded that, because the Policy Requirement substantially impaired First Amendment protected activity conducted by private entities with private funds as a condition of receiving a government benefit, heightened scrutiny was warranted. Alliance I, 430 F.Supp.2d at 259. The court then concluded that the Policy Requirement, as applied to AOSI and Pathfinder, violated the First Amendment because it was not narrowly tailored, imposed a viewpoint-based restriction on their use of private funds without allowing for adequate alternative channels of communication, and “compelled] speech by affirmatively requiring [them] to adopt a policy espousing the government’s preferred message.” Id. at 268-76. Accordingly, the court held that AOSI and Pathfinder had demonstrated a likelihood of success on the merits, and had met their burden of showing irreparable harm. Id. at 276, 278. The district court thus preliminarily enjoined Defendants from enforcing the Policy Requirement against AOSI or Pathfinder, and Defendants appealed.
The First Appeal
During the course of the first appeal, the Agencies informed us that HHS and *226 USAID were developing guidelines that would allow grantees to establish or work with separate affiliates that would not be subject to the Policy Requirement. The Agencies were of the view that the guidelines would satisfactorily address the relevant constitutional concerns in accordance with our decision in Brooklyn Legal Services Corp. v. Legal Services Corp., 462 F.3d 219, 223-24 (2d Cir.2006) (“[I]n appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression.”). After the guidelines became effective, we remanded the case to the district court to determine in the first instance whether interlocutory relief continued to be appropriate. Alliance for Open Soc’y Int’l, Inc. v. U.S. Agency for Int’l Dev., 254 Fed. Appx. 843, 846 (2d Cir.2007) (“Alliance II”).
The Guidelines
The Guidelines permit recipients of Leadership Act funds to partner with affiliate organizations that do not comply with the Policy Requirement, provided that the recipient and affiliate maintain “adequate separation” so as not to “threaten the integrity of the Government’s programs and its message opposing prostitution.” HHS Guidance, 72 Fed.Reg. 41,076 (July 26, 2007); USAID Acquisition & Assistance Policy Directive (“AAPD”) 05-04 Amendment 1 (July 23, 2007). The Guidelines (which, as discussed infra, were slightly revised in 2010), require recipients to have “objective integrity and independence” from any affiliate that “engages in activities inconsistent with [an] opposition to the practice[ ] of prostitution ... (‘restricted activities’).” 45 C.F.R. § 89.3 (2010).
The Guidelines, as initially promulgated, provided that a recipient would be deemed to have “objective integrity and independence”- — i.e., adequate separation — from an affiliate if (1) the two entities are legally separate; (2) no Leadership Act funds are transferred to the affiliate or used to subsidize its restricted activities; and (3) the entities are physically and financially separate. 72 Fed.Reg. at 41,076. The 2007 Guidelines elaborated that “whether sufficient physical and financial separation exists” would be determined “case-by-case,” and set forth five, non-exclusive factors relevant to that determination: (i) the existence of separate personnel, management, and governance; (ii) the existence of separate accounts and records; (iii) the degree of separation between the recipient’s facilities and facilities used by the affiliate to conduct restricted activities; (iv) the extent to which signs and other forms of identification distinguish the two entities; and (v) the extent to which the government and the Leadership Act program are “protected from public association with the affiliated organization and its restricted activities.” Id. at 41,077.
The District Court’s Second Decision
On remand, AOSI and Pathfinder moved to amend the complaint to add Global Health Council and InterAction (together, the “Associations”) as plaintiffs, and to extend the preliminary injunction to cover the Associations. GHC is an alliance of organizations dedicated to international public health. InterAction is an alliance of international development and humanitarian NGOs. Many of the Associations’ U.S.based members — which include Pathfinder, a member of both GHC and InterAction — participate in the international fight against HIV/AIDS, receive Leadership Act funding, are therefore subject to the Policy Requirement, and desire relief from it. These member organizations’ HIV/AIDS-prevention work includes administering health services and other programs that expressly target at-risk groups like prosti *227 tutes. They also engage in advocacy and discussion concerning controversial global health issues — for example, best practices for reducing HIV/AIDS among prostitutes — at policy forums and conferences.
In August 2008, the district court permitted GHC and InterAction to join the litigation, extended the preliminary injunction to them, and went on to consider whether interlocutory relief continued to be warranted in light of the Guidelines. Alliance for Open Soc’y Int% Inc. v. U.S. Agency for Int’l Dev., 570 F.Supp.2d 533 (S.D.N.Y.2008) (‘Alliance III”). The court held that it was, concluding that the Guidelines did not affect its previous determination that the Policy Requirement impermissibly compelled speech. The court reasoned that “[wjhile the Guidelines may or may not provide an adequate alternate channel for Plaintiffs to express their views regarding prostitution,” the clause requiring them to espouse the government’s viewpoint “remains intact.” Id. It also concluded that heightened scrutiny remained applicable because the Policy Requirement discriminates based on viewpoint, and that the Guidelines were too burdensome to cure the Requirement’s constitutional defects. Id. at 546-49. Accordingly, the court declined to disturb its preliminary injunction. Defendants appealed from both the 2006 and 2008 preliminary injunction orders.
Additional Guidance Promulgated by Defendants
In April 2010, while this appeal was pending, HHS and USAID promulgated further guidance pertaining to the Policy Requirement — HHS in a formal regulation, USAID in a policy directive. HHS, Organizational Integrity of Entities That Are Implementing Programs and Activities Under the Leadership Act, 75 Fed. Reg. 18,760 (Apr. 13, 2010) (codified at 45 C.F.R. pt. 89); USAID AAPD 05-04 Amendment 3 (Apr. 13, 2010). The new guidance specifies that in order to comply with the Policy Requirement, a Leadership Act grantee must affirmatively state in the funding document that it is “opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women, men, and children,” 45 C.F.R. § 89.1; AAPD 05-04 Amend. 3 at 2, and reaffirms that a recipient “cannot engage in activities that are inconsistent with [its] opposition to prostitution,” 75 Fed.Reg. at 18,760. Neither the 2010 nor the 2007 guidance offers recipients insight as to what activities may be deemed “inconsistent” with an “opposition to prostitution.”
The new guidance also modified the Guidelines for partnering with an affiliate that does not comply with the Policy Requirement. See 45 C.F.R. § 89.3. For example, under the revised Guidelines, which profess to “allow more flexibility for funding recipients,” 75 Fed.Reg. at 18,762, legal separation is no longer required but only one factor to be considered, and separate management is no longer expressly identified as a relevant factor, in determining whether a recipient has “objective integrity and independence” from an affiliate, 45 C.F.R. § 89.3.
DISCUSSION
I. Standing
The Agencies initially argue that Plaintiffs lack standing. Plaintiffs bear the burden of establishing standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). “Because standing is challenged [here] on the basis of the pleadings, we accept as true all material allegations of the complaint, and must construe the complaint in favor of [Plaintiffs].” W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & *228 Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (internal quotation marks omitted). We review questions of standing de novo. Carver v. City of New York, 621 F.3d 221, 225 (2d Cir.2010).
Three elements comprise the “irreducible constitutional minimum” of standing: (1) the plaintiff must have suffered an injury-in-fact — an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan, 504 U.S. at 560-61,112 S.Ct. 2130.
Because GHC and InterAction are suing on behalf of their members, each must establish associational standing by demonstrating that (a) at least one of the association’s members would otherwise have standing to sue in its own right — i.e., has constitutional standing; (b) the interests the association seeks to protect are germane to its purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Wash. State Apple Adver. Comm’n, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The district court held that Plaintiffs had established standing. As explained below, we conclude that the district court was correct.
A. Injury-in-Fact
We have little difficulty finding that Plaintiffs have alleged constitutional injury-in-fact, and face actual or imminent harm as a result of the Policy Requirement. They allege that the Requirement has compelled AOSI, Pathfinder, and many of the Associations’ members to adopt policy statements that they otherwise would not have adopted, and that it restricts them from engaging in privately funded activities and speech that is essential to them work but that the Agencies might deem inconsistent with an opposition to prostitution.[2] Pathfinder, for example, “wishe[s] to remain neutral” on the issue of prostitution, but adopted an anti-prostitution policy statement in order to avoid losing Leadership Act funding, and alleges that it would, in the absence of the injunctions, self-censor its prostitution-related speech at conferences, in publications, and on its website.
Defendants contend that the alleged injuries are merely conjectural because no plaintiff has “attempted to form an affiliate” and “avail [itself] of th[at] alternative avenue[ ] for communication.” Appellants’ Br. 22-23. But standing jurisprudence makes clear that Plaintiffs need not go through the potentially burdensome process of setting up an affiliate organization before they can bring a First Amendment challenge. See Virginia v. Am. Booksellers Ass’n, 484 U.S. 383, 392-93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (finding standing where newly enacted statute had not yet been enforced because compliance would have required plaintiffs “to take significant and costly ... measures,” and “the alleged danger of th[e] statute [was], in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution”). Moreover, as elaborated upon below, infra at 238-40, forming an affiliate cannot remedy the grantee’s injury resulting from being compelled to affirmatively state the government’s position on prostitution.
*229 B. Associational Standing
Defendants contend that GHC and InterAction lack associational standing because they fail the third prong of the Hunt test, under which they must establish that “neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.” 432 U.S. at 343, 97 S.Ct. 2434. We disagree. As an initial matter, the third prong of the associational standing test is “prudential,” not constitutional, and is “best seen as focusing on ... matters of administrative convenience and efficiency.” United Food & Commercial Workers Union Local 751 v. Brown Grp., 517 U.S. 544, 555-56, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Accordingly, district courts possess a degree of discretion in applying it. See Ctr. for Reprod. Law v. Bush, 304 F.3d 183, 196 (2d Cir.2002) (Sotomayor, J.) (“[T]he prudential requirements of standing have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial self-restraint further to protect, to the extent necessary under the circumstances, the purpose of Article III.” (internal quotation marks omitted)). Here, the district court correctly concluded that “neither the claims asserted nor the relief requested by the Associations would require any significant participation of individual members in the lawsuit.” Alliance III, 570 F.Supp.2d at 543.
We agree with the district court that the “relief requested” component of the third Hunt prong has been satisfied because the Associations seek an injunction barring enforcement of the Policy Requirement, which will not necessitate the participation of individual members in the lawsuit. See Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (when an association seeks equitable relief, “it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured”). However, as the Agencies correctly assert, the third prong of the Hunt test is not “automatically satisfie[d]” whenever an association “request[s] equitable relief rather than damages.” Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir.2004). Courts “also must examine the claims asserted to determine whether they require individual participation.” Rent Stabilization Ass’n v. Dinkins, 5 F.3d 591, 596 (2d Cir.1993); see Bano, 361 F.3d at 714 (“[An] organization lacks standing to assert claims of injunctive relief on behalf of its members where the fact and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof .... ” (internal quotation marks omitted)).
The Agencies argue that “[individualized proof is required” in this case because resolving whether the Guidelines permit recipients to set up adequate alternative channels for protected expression necessitates a fact-specific determination for each recipient. Appellants’ Br. 25. First, it is self-evident that, as the district court concluded, individualized proof is not required for the compelled speech and vagueness claims, “as it is the conduct of Defendants in the form of the Policy Requirement and the Guidelines that will be the primary subject of inquiry.” Alliance III, 570 F.Supp.2d at 543. With respect to the adequate alternative channels analysis, we agree with the district court that while it will “require a more thorough factual development to establish the extent of the burden on the Associations’ members,” individualized evidence of members’ efforts to comply with the Guidelines “would be duplicative and redundant[,] counseling] in favor of granting associational standing in the interests of judicial economy.” Id. at 544; see Nat’l Ass’n of Coll. Bookstores *230 v. Cambridge Univ. Press, 990 F.Supp. 245, 250 (S.D.N.Y.1997) (“The fact that a limited amount of individuated proof maybe necessary does not in itself preclude associational standing.”)- This reasoning finds support in Hunt itself, which held that an association of apple growers had standing to challenge a statute, notwithstanding the varied nature and extent of the burdens suffered by the association’s members in complying with the statute. See , 432 U.S. at 343-44, 97 S.Ct. 2434. Accordingly, we conclude that GHC and InterAction have adequately alleged associational standing.
II. Preliminary Injunctions
We review the grant of a preliminary injunction for abuse of discretion. Alleyne v. N.Y. State Educ. Dep’t, 516 F.3d 96, 100 (2d Cir.2008). “A district court abuses its discretion when (1) its decision rests on an error of law ... or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions.” Mullins v. City of New York, 626 F.Sd 47, 51 (2d Cir.2010) (internal quotation marks omitted). Where, as here, the moving parties seek to “stay[ ] government action taken in the public interest pursuant to a statutory or regulatory scheme,” they must establish (1) a likelihood of success on the merits, and (2) irreparable harm in the absence of an injunction. Alleyne, 516 F.3d at 100 (internal quotation marks omitted); accord Lynch v. City of New York, 589 F.3d 94, 98 (2d Cir.2009). Ultimately, “[i]f the underlying constitutional question is close, ... we should uphold the injunction.” VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 185 (2d Cir.2010) (alteration in original) (quoting Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 664, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004)).
On appeal, Defendants challenge the district court’s determination that Plaintiffs are likely to succeed on the merits. They do not contest the district court’s finding of irreparable harm. We conclude that Plaintiffs have demonstrated a likelihood of success on the merits because the Policy Requirement likely violates the First Amendment by impermissibly compelling Plaintiffs to espouse the government’s viewpoint on prostitution.
A. The Policy Requirement Likely Violates the First Amendment
1. Spending Clause and Unconstitutional Conditions Jurisprudence
The Spending Clause of the Constitution empowers Congress to “lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.” U.S. Const, art. I, § 8, cl. 1. This provision allows Congress to “condition[ ] [the] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.” South Dakota v. Dole, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (quoting Fullilove v. Klutznick, 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)). It is well settled that Congress is entitled to further policy goals indirectly through its spending power that it might not be able to achieve by direct regulation. See id. at 207, 107 S.Ct. 2793 (“[Objectives not thought to be within Article I’s enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds.” (internal quotation marks and citation omitted)). Congress’s power under the Spending Clause is broad, as “the constitutional limitations on Congress when exercising its spending power *231 are less exacting than those on its authority to regulate directly.” Id. at 209, 107 S.Ct. 2793.
Defendants contend that because the Leadership Act is a Spending Clause enactment, and Plaintiffs are free to decline funding if they do not wish to comply with its conditions, the Policy Requirement should be subjected to only minimal scrutiny under Dole. But Congress’s spending power, while broad, is not unlimited, and other constitutional provisions may provide an independent bar to the conditional grant of federal funds. Pursuant to this “unconstitutional conditions” doctrine, as it has come to be known, the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient’s constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance. See Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (“[E]ven though a person has no ‘right’ to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech.”). As the Supreme Court recently reiterated, “the government may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.” Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (“FAIR”) (internal quotation marks omitted).
This tension between the breadth of Congress’s spending power on one hand and the principle that a condition on the receipt of federal funds may not infringe upon the recipient’s First Amendment rights on the other has given rise to three seminal Supreme Court decisions and several related cases from our Circuit. The Supreme Court cases are Regan v. Taxation With Representation, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), FCC v. League of Women Voters of California, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), and Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Our cases include a series of decisions concerning conditions imposed upon recipients of funding from the Legal Services Corporation (“LSC”): Velazquez v. Legal Services Corp., 164 F.3d 757 (2d Cir.1999) (“Velazquez I”), Legal Services Corp. v. Velazquez, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (“Velazquez II ”), and Brooklyn Legal Services Corp. v. Legal Services Corp., 462 F.3d 219 (2d Cir.2006) (“BLS ”).
In Regan, plaintiff Taxation With Representation (“TWR”), a nonprofit lobbying corporation, challenged a statute that denied tax deductions to organizations that engaged in “substantial lobbying.” 461 U.S. at 541, 544, 103 S.Ct. 1997; see 26 U.S.C. § 501(c)(3). TWR argued that the prohibition against substantial lobbying by § 501(c)(3) organizations imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Supreme Court disagreed, concluding that TWR remained free to receive deductible contributions to support its nonlobbying activity, and could create a separate, tax-exempt affiliate under § 501(c)(4) to pursue its lobbying activity. Id. at 544-45, 103 S.Ct. 1997. Given that alternative, the Court concluded that Congress “ha[d] not infringed any First Amendment rights or regulated any First Amendment activity,” but “simply chosen not to pay for TWR’s lobbying.” Id. at 546, 103 S.Ct. 1997. In *232 a concurring opinion, Justice Blackmun emphasized “the saving effect of § 501(e)(4),” stating his view that “ § 501(c)(3) alone” would be “constitutionally] defective],” but that “[a] § 501(c)(3) organization’s right to speak is not infringed, because it is free to [lobby] through its § 501(c)(4) affiliate without losing tax benefits for its nonlobbying activities.” Id. at 552-53, 103 S.Ct. 1997 (Blackmun, J., concurring).
The following term, the Supreme Court decided League of Women Voters, which involved a First Amendment challenge to a provision in the Public Broadcasting Act that prohibited stations receiving federal funds from “editorializing.” 468 U.S. at 367, 104 S.Ct. 3106. The Court struck down the provision, troubled by the fact that it “barred [a grantee] from using even wholly private funds to finance its editorial activity.” Id. at 400, 104 S.Ct. 3106 (stating that “unlike the situation faced by [TWR], a [station] that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing”). The Court noted, however, that if recipients were permitted “to establish ‘affiliate’ organizations which could then use the station’s facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of [Regan],” as the recipient “would be free, in the same way that [TWR] was free, to make known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its noneditorializing broadcast activities.” Id.
The Supreme Court elaborated on these themes in Rust, which involved a facial challenge to HHS regulations implementing Title X of the Public Health Service Act. 500 U.S. at 177-78, 111 S.Ct. 1759. Title X authorizes HHS to make grants to organizations to help them run “family planning projects,” but provides that no Title X funds “shall be used in programs where abortion is a method of family planning.” Id. at 178, 111 S.Ct. 1759 (quoting 42 U.S.C. §§ 300(a), 300a-6). The HHS regulations prohibited Title X projects from providing abortion counseling or referrals, or engaging in any activities that encourage, promote, or advocate abortion as a method of family planning. Id. at 179-80, 111 S.Ct. 1759. However, the regulations allowed grantees to engage in abortion-related activities as long as their Title X projects maintained “objective integrity and independence” from such activities — a determination to be made by HHS based on factors such as the existence of separate personnel, and the degree of separation between the Title X project and facilities used for restricted activities. Id. at 180-81, 111 S.Ct. 1759 (quoting 42 C.F.R. § 59.9 (1989)). The Rust plaintiffs argued that the regulations violated the First Amendment because they “diseriminat[ed] based on viewpoint [by] prohibiting] all discussion about abortion as a lawful option,” and because they conditioned the receipt of Title X funds on relinquishing the right to engage in abortion-related speech. Id. at 192, 196, 111 S.Ct. 1759 (internal quotation marks omitted).
The Supreme Court disagreed, concluding that “the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.” Id. at 193, 111 S.Ct. 1759 (“The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.”). It held that the regulations “do not force the Title X grantee to give up abortion-related speech,” but “merely require that the *233 grantee keep such activities separate and distinct from Title X activities.” Id. at 196, 111 S.Ct. 1759. The Court emphasized that this was unlike the funding condition found unconstitutional in League of Women Voters, where “the Government ha[d] placed [the] condition on the recipient of the subsidy rather than on a particular program or service.” Id. at 197, 111 S.Ct. 1759 (emphasis in original).
We turn now to three decisions of this Court arising under the Legal Services Corporation Act of 1974, pursuant to which the LSC makes grants to local organizations that provide free legal assistance to indigent clients. Velazquez I, 164 F.3d at 759. In 1996, Congress passed legislation barring LSC grants to entities that engage in certain activities, such as lobbying or class actions, thereby “restricting] grantees’ use of non-federal and federal funds alike.” Id. at 760. In order to cure the “constitutional infirmities” of the 1996 restrictions, LSC issued “program integrity” regulations, modeled after those upheld in Rust, allowing grantees to affiliate with organizations that did engage in prohibited activities, as long as the entities maintained adequate physical and financial separation. Id. at 761-62.
In Velazquez I, we considered a facial challenge to the 1996 statute and LSC regulations, which the plaintiffs argued “impermissibly burden[ed] grantees’ exercise of First Amendment activities,” and “constitut[ed] a viewpoint-based restriction on expression.” Id. at 763. Judge Leval, writing for the majority, synthesized Regan, League of Women Voters, and Rust as establishing “that, in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression.” Id. at 766. The facial challenge therefore failed, because although the affiliate option might, as applied to some LSC grantees, prove unduly burdensome, there was no reason to think this would be true for all grantees. Id. at 767. However, one provision in the 1996 statute, which prohibited grantees from representing clients challenging existing welfare law, was held invalid as impermissible viewpoint discrimination. Id. at 769-72.
The Supreme Court affirmed our invalidation of that viewpoint-based restriction in Velazquez II. 531 U.S. at 540-41, 121 S.Ct. 1043. The Court interpreted Rust as having implicitly “reli[ed] on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech,” explaining that “viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like Rust, in which the government use[s] private speakers to transmit information pertaining to its own program.” Id. at 541, 121 S.Ct. 1043 (internal quotation marks and citation omitted). The Velazquez II Court held, however, that the LSC program, unlike Title X, was not “designed ... to promote a governmental message,” as an LSC-funded lawyer “is not the government’s speaker,” but rather “speaks on the behalf of his or her private, indigent client.” Id. at 542, 121 S.Ct. 1043. Therefore, Rust did not save the viewpoint-based restriction on seeking welfare reform. The Court declined to review the portion of Velazquez I that had upheld the LSC’s program integrity regulations. 532 U.S. 903, 121 S.Ct. 1224, 149 L.Ed.2d 135 (2001) (Mem.) (denying certiorari).
Following Velazquez II, the Velazquez plaintiffs brought an as-applied challenge to the LSC regulations. BLS, 462 F.3d at 224. The district court enjoined application of the regulations, reasoning that they imposed an “undue burden” on the plain *234 tiffs’ First Amendment rights, as LSC’s interest in program integrity could be fulfilled by “means less restrictive.” Id. at 222, 229. On appeal, we held that the district court’s application of an undue burden/less-restrictive-means test to the regulations was error, reiterating the standard articulated in Velazquez I — that grantees’ First Amendment rights may be burdened if they are left with “adequate alternative channels” for protected expression. Id. at 229-31. We therefore remanded for the district court to evaluate the program integrity regulations under that standard.
2. The Policy Requirement Warrants Heightened Scrutiny
Applying these cases to the one before us, we conclude that the Policy Requirement, as implemented by the Agencies, falls well beyond what the Supreme Court and this Court have upheld as permissible funding conditions. Unlike the funding conditions in the cases discussed above, the Policy Requirement does not merely restrict recipients from engaging in certain expression (such as lobbying {Regan), editorializing {League of Women Voters), abortion-related speech {Rust), or welfare reform litigation (the LSC cases)), but pushes considerably further and mandates that recipients affirmatively say something — that they are “opposed to the praetice[] of prostitution,” 45 C.F.R. § 89.1. The Policy Requirement is viewpoint-based, and it compels recipients, as a condition of funding, to espouse the government’s position.
Compelling speech as a condition of receiving a government benefit cannot be squared with the First Amendment. See, e.g., Wooley v. Maynard, 430 U.S. 705, 714-17, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (finding unconstitutional requirement that drivers, as condition of using the roads, display state motto “Live Free or Die” on license plates); Speiser v. Randall, 357 U.S. 513, 518-19, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (finding unconstitutional requirement that veterans, as condition of receiving property tax exemption, declare that they do not advocate the forcible overthrow of government); W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 633, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (finding unconstitutional requirement that schoolchildren, as condition of going to school, salute the flag; stating that such “involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence”).
Here, much as in Wooley, Speiser, and Barnette, silence, or neutrality, is not an option for Plaintiffs. In order to avoid losing Leadership Act funding, they must declare their opposition to prostitution. As Defendants correctly point out, these traditional “compelled speech” cases involved already-existing public benefits, not government funding programs, and are therefore distinguishable in that respect. But these cases teach that where, as here, the government seeks to affirmatively require government-preferred speech, its efforts raise serious First Amendment concerns.[3] The Supreme *235 Court recently implied as much in FAIR, where it upheld the Solomon Amendment’s requirement that universities permit military recruiters on campus as a condition of receiving federal funding. The Court noted that “[t]here is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse.” 547 U.S. at 61-62, 126 S.Ct. 1297. The Policy Requirement calls for exactly that.
The Policy Requirement is also viewpoint-based, because it requires recipients to take the government’s side on a particular issue. It is well established that viewpoint-based intrusions on free speech offend the First Amendment. See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (“It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.”); Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (stating “broad[ ] principle [that] [regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment” (internal quotation marks omitted)).
Although viewpoint-based funding conditions that target speech are not necessarily unconstitutional, see Rust, 500 U.S. 173, 111 S.Ct. 1759, such conditions are constitutionally troublesome. In Regan, for example, the Court applied minimal scrutiny in reviewing a condition that was, unlike the Policy Requirement, decidedly viewpoint-neutral (it banned all lobbying by § 501(c)(3) organizations, regardless of the nature of the legislation or the organization’s position on it). See 461 U.S. at 541, 548, 103 S.Ct. 1997. In League of Women Voters, which invalidated a viewpoint-neutral restriction on “editorializing,” all four dissenting Justices indicated that if the restriction were viewpoint-based, they too would find it constitutionally problematic. See 468 U.S. at 407-08, 104 S.Ct. 3106 (Rehnquist, J., dissenting) (emphasizing that condition was “strictly neutral,” not directed at “editorial views of one particular ideological bent”); id. at 413, 104 S.Ct. 3106 (Stevens, J., dissenting) (“[0]f greatest significance for me, the statutory restriction is completely neutral in its operation — it prohibits all editorials without any distinction being drawn concerning ... the point of view that might be expressed.”); cf. Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510 (“When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.”).
The LSC cases confirm this conclusion. In Velazquez I, we invalidated as viewpoint-discriminatory a restriction prohibiting LSC grantees from representing clients seeking welfare reform. 164 F.3d at 769-72. The Supreme Court affirmed, concluding that Rust could not justify the restriction because although, as Rust had implicitly established, “viewpoint-based funding decisions can be sustained in instances in which ... the government use[s] private speakers to transmit information pertaining to its own program,” the LSC grantees were not speaking on behalf *236 of the government. Velazquez II, 531 U.S. at 540-42, 121 S.Ct. 1043 (internal quotation marks omitted). Finally, in BLS, while we remanded for the district court to apply the “adequate alternative channels” test to the LSC’s viewpoint-neutral program integrity regulations, we expressly recognized, citing Velazquez I, that “substantive restrictions that are directed toward speech as such” might require “closer attention” — an issue that “[went] to the ... statutory restrictions challenged in [the LSC] cases.” See BLS, 462 F.3d at 230. The Policy Requirement is substantive, viewpoint-based, and “directed toward speech,” as it affirmatively requires recipients to speak. It is this bold combination in a funding condition of a speech-targeted restriction that is both affirmative and quintessential^ viewpoint-based that warrants heightened scrutiny.
Furthermore, the targeted speech, concerning prostitution in the context of the international HIV/AIDS-prevention effort, is a subject of international debate. The right to communicate freely on such matters of public concern lies at the heart of the First Amendment. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (“[E]xpression on public issues has always rested on the highest rung of the hierarchy of First Amendment values.” (internal quotation marks omitted)). The Policy Requirement offends that principle, mandating that Plaintiffs affirmatively espouse the government’s position on a contested public issue where the differences are both real and substantive. For example, the World Health Organization (“WHO”) and the Joint United Nations Programme on HIV/AIDS (“UNAIDS”) have recognized advocating for the reduction of penalties for prostitution — to prevent such penalties from interfering with outreach efforts — as among the best practices for HIV/AIDS prevention.[4] Plaintiffs claim that being forced to declare their opposition to prostitution “harms [their] credibility and integrity as NGOs, which generally avoid taking controversial policy positions likely to offend host nations [and] partner organizations,” and risks “offending all of the[] groups whose approach to HIV/AIDS may differ from that of the government,” not to mention some of the very people, prostitutes, “whose trust they must earn to stop the spread of HIV/AIDS.” Appellees’ Br. 11-12.
3. Rust and the Government-Speech Doctrine
In defending the Policy Requirement’s viewpoint-based speech mandate, the Agencies turn to Rust, which upheld a viewpoint-based prohibition on abortion counseling. Since Rust, the Supreme Court has “explained” that decision as having implicitly relied upon a “government speech” principle, stating that: “viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like Rust, in which the government use[s] private speakers to transmit information pertaining to its own program.” Velazquez II, 531 U.S. at 541, 121 S.Ct. 1043 (internal quotation marks and citation omitted). This is because “when the government appropriates public funds to promote a particular policy of its own it is entitled to say *237 what it wishes.” Rosenberger, 515 U.S. at 833, 115 S.Ct. 2510 (“[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.”). Therefore, “[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.” Id.
According to the Agencies, this case is, like Rust, a government-speech case because in enacting the Leadership Act, Congress “sought to advance to the greatest extent possible its message opposing prostitution,” “chose to enlist the recipients of Leadership Act funding to disseminate its message,” and, “to ensure that the message was conveyed effectively, ... required that those recipients have [an anti-prostitution] policy.” Appellants’ Br. 32; see DKT Int’l, Inc. v. U.S. Agency for Int'l Dev., 477 F.3d 758, 761-63 (D.C.Cir.2007) (upholding Policy Requirement). We are not persuaded.
The Policy Requirement goes well beyond the funding condition upheld in Rust because it compels Plaintiffs to voice the government’s viewpoint and to do so as if it were their own. Indeed, the Rust Court expressly observed that “[n]othing in [the challenged regulations] requires a doctor to represent as his own any opinion that he does not in fact hold.” 500 U.S. at 200, 111 S.Ct. 1759 (emphasis added). Rather, the grantee’s staff could remain “silenft] with regard to abortion,” and, if asked about abortion, was “free to make clear that advice regarding abortion is simply beyond the scope of the program.” Id.[5] Here, on the other hand, Plaintiffs do not have the option of remaining silent or neutral. Instead, they must represent as their own an opinion — that they affirmatively oppose prostitution — that they might not categorically hold. Suffice it to say that Rust would have been a very different case had the government gone as far as requiring Title X recipients to affirmatively adopt a policy statement opposing abortion, in the way the Leadership Act mandates the adoption of a policy statement opposing prostitution. The government has, by compelling NGOs to affirmatively pledge their opposition to prostitution, stepped beyond what might have been appropriate to ensure that its anti-prostitution message would not be “garbled” or “distorted,” Rosenberger, 515 U.S. at 833, 115 S.Ct. 2510.
We do not mean to imply that the government may never require affirmative, viewpoint-specific speech as a condition of participating in a federal program. To use an example supplied by Defendants, if the government were to fund a campaign urging children to “Just Say No” to drugs, we do not doubt that it could require grantees to state that they oppose drug use by children. But in that scenario, the government’s program is, in effect, its message. That is not so here. The stated purpose of the Leadership Act is to fight HIV/AIDS, as well as tuberculosis, and malaria.[6] De *238 fendants cannot now recast the Leadership Act’s global HJV/AIDS-prevention program as an anti-prostitution messaging campaign. Cf Velazquez II, 531 U.S. at 547, 121 S.Ct. 1043 (“Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.”). If the government-speech principle allowed Congress to compel funding recipients to affirmatively espouse its viewpoint on every subsidiary issue subsumed within a federal spending program, the exception would swallow the rule.
Defendants assert that advocating against prostitution is indeed “central” to the Leadership Act program, Appellants’ Br. 32, but it is difficult to reconcile that assertion with what the Act does. As we have seen, the Policy Requirement expressly exempts three organizations and all U.N. agencies from having to comply with it. 22 U.S.C. § 7631(f) (“[T]his subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.”). As previously noted, the WHO and UNAIDS have taken a public position at odds with the Policy Requirement, recognizing the reduction of penalties for prostitution as a best practice in the fight against HIV/AIDS. Defendants attempt to distinguish these exempted recipients on the ground that they are “public international organizations,” such that forcing them to adopt an anti-prostitution policy would require “multilateral negotiations.” Appellants’ Br. 58. But if anti-prostitution advocacy were central to the government’s program, it could, of course, simply choose not to fund these organizations. In short, the Agencies’ suggestion that requiring Plaintiffs to adopt an anti-prostitution policy statement is integral to the Leadership Act program is undermined by the fact that the government has chosen to fund high-profile, global organizations that remain free to express — and indeed openly express — a contrary policy, or no policy at all.[7]
Nor are we persuaded by the Agencies’ argument that the Policy Requirement is entitled to “leeway” because it implicates “foreign affairs.” Appellants’ Br. 34-35. While mindful of the government’s strong interest in managing international relations, we agree with the district court that this interest, in this case, does not warrant the deference that the Agencies request. See Alliance I, 430 F.Supp.2d at 265-67. The Agencies’ reliance on DKT Memorial Fund Ltd. v. Agency for International Development, 887 F.2d 275 (D.C.Cir.1989), is misplaced, as that case centered around a restriction on the First Amendment activities of foreign NGOs receiving U.S. government funds. The challenge here is to the impact of the Policy Requirement on domestic NGOs. Indeed, the Agencies have applied the Policy Requirement to foreign organizations since its inception, without challenge. This litigation arose only after the government reversed course and began also applying the Requirement to U.S.based organizations like AOSI and Path *239 finder. The Policy Requirement compels domestic NGOs to adopt a policy statement on a particular issue, and prohibits them from engaging in certain expression at, for example, conferences and forums throughout the United States. These factors convince us that the speech is far more of a domestic than a foreign concern.
4. The Guidelines
Finally, the Agencies contend that any compelled-speech type problems in the Policy Requirement are successfully addressed by the Guidelines because any entity unwilling to state its opposition to prostitution can form an affiliate that does so. As a consequence, the Agencies assert, the parent organization is not compelled to speak any message at all. But this assertion fails to confront the fact that whether the recipient is a parent or an affiliate, it is required to affirmatively speak the government’s viewpoint on prostitution. The “adequate alternative channels for protected expression” test, which is predicated on the rationale that limitations on speech are permissible if grantees can express their opinions elsewhere, does not provide the proper framework for evaluating the Policy Requirement’s speech mandate. The curative function of an “adequate alternative channel” is to alleviate the burden of a constraint on speech by providing an outlet that allows an organization to engage — through the use of an affiliate — in the privately funded expression that otherwise would have been impermissibly prohibited by the federal program. For example, in Regan, a § 501(c)(3) organization’s ability to form a § 501(c)(4) affiliate freed it to engage in privately funded lobbying, and, in League of Women Voters, the funding restriction would have been saved if the recipient stations had been allowed to form affiliates to engage in privately funded editorializing. It simply does not make sense to conceive of the Guidelines here as somehow addressing the Policy Requirement’s affirmative speech requirement by affording an outlet to engage in privately funded silence; in other words, by providing an outlet to do nothing at all. It may very well be that the Guidelines afford Plaintiffs an adequate outlet for expressing their opinions on prostitution, but there remains, on top of that, the additional, affirmative requirement that the recipient entity pledge its opposition to prostitution. As the district court aptly stated, “[w]hile the Guidelines may or may not provide an adequate alternate channel for Plaintiffs to express their views regarding prostitution, the clause requiring Plaintiffs to adopt the Government’s view regarding ... prostitution remains intact.” Alliance III, 570 F.Supp.2d at 545. The Guidelines, by their very nature, do not account for that requirement.
For the reasons set forth above, we conclude that Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment challenge. Because the Policy Requirement compels grantees to espouse the government’s position on a controversial issue, the district court did not abuse its discretion in preliminarily enjoining its enforcement pending a trial on the merits.[8]
*240 CONCLUSION
The district court’s grant of preliminary injunctive relief is AFFIRMED.

. The Leadership Act was reauthorized and amended in 2008. Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008, Pub.L. No. 110— 293, 122 Stat. 2918; see 22 U.S.C. § 7671. We cite to the current version of the Act.

. Plaintiffs allege that twenty of GHC's members and twenty-eight of InterAction’s members have adopted anti-prostitution policy statements that they did not wish to make.

. The dissent devotes considerable energy to the effort of showing that Wooley, Speiser, and Barnette do not control this case. We do not suggest that they do. Indeed, as the dissent acknowledges, we expressly recognize that these compelled speech cases are distinguishable. But we do draw from them the underlying principle that the First Amendment does not look fondly on attempts by the government to affirmatively require speech. In doing so, we do not "put[] ... aside" the unconstitutional conditions doctrine, Dissent at 255, but rather realize that although Regan and its progeny unquestionably provide the framework for our analysis, they do not capture the Policy Requirement as neatly as the dissent suggests. The dissent asserts that "[njone of those [unconstitutional conditions] *235 cases turned on whether the alleged speech restriction was affirmative or negative,” Dissent at 257, but that is easy to say when none of those cases involved an affirmative speech restriction. It is partly because the Policy Requirement is just such a restriction that it pushes beyond the restrictions upheld in Regan, Rust, and the LSC cases, and that we conclude Plaintiffs are likely to succeed in demonstrating that it is an unconstitutional condition.

. The dissent declines to comment on the type of speech at issue, and asserts that “the substantive validity” of Plaintiffs’ position on prostitution is "not determinative of whether the Policy Requirement is constitutional.” Dissent at 266. But we do not suggest that the validity of Plaintiffs’ position on the proper approach to prostitution is relevant; rather, it is the fact that the targeted speech concerns a controversial public issue that is constitutionally significant.

. The Rust Court made these observations in the course of addressing the plaintiffs' claim that the regulations violated the First Amendment rights of the grantee’s staff, a claim the Court stated was governed by the "same principles” as the claim that the regulations violated the First Amendment rights of the grantee. 500 U.S. at 198, 111 S.Ct. 1759.

. The dissent’s counter-hypothetical, involving "potential grantees who do not actually oppose drug use by children, but are tempted by the offer of funds,” Dissent at 264, misses the point. Our analysis does not turn on whether individual grantees actually disagree with the government-mandated speech, but rather on the nature of the program. We use the phrase "do so as if it were their own,” *238 supra at 237, simply to highlight the invasiveness of a condition that requires a recipient to affirmatively represent to the world that it, as an independent, non-governmental entity, holds an opinion — the government's opinion — that it may or may not in fact hold.

. Contrary to the dissent's suggestion, we do not make any "policy judgment” in connection with Congress's decision to exempt these organizations. Dissent at 266. We simply note that § 7631(f)’s exemption clause undercuts the Agencies' assertion that the adoption of an anti-prostitution policy is central to the Leadership Act program.

. Because we affirm on this ground, we, like the district court, do not reach Plaintiffs' argument that the Policy Requirement, as implemented by the Agencies, is unconstitutionally vague with respect to what sorts of speech are prohibited as "inconsistent with [an] opposition to the practice[] of prostitution.” 45 C.F.R. § 89.3. Plaintiffs contend that because the Agencies have not promulgated any guidance regarding the kinds of speech and activities that will be deemed insufficiently opposed to prostitution, it is unclear in what prostitution-related expression grantees may, and may not, engage. Plain *240 tiffs point out that the restrictions on speech at issue in the LSC cases, the cases on which the Agencies have attempted to model the instant regime, were substantially more specific than the Policy Requirement is here. Indeed, oral argument left us with the distinct impression that not even Defendants have a grasp on what it means to engage in expression that is ''inconsistent” with an opposition to prostitution.