11-2735-cv (L)
The Evergreen Association, Inc. v. City of New York

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: September 14, 2012　　　　　Decided: January 17, 2014)

Docket Nos. 11-2735-cv, 11-2929-cv

_____


THE EVERGREEN ASSOCIATION, INC., DBA EXPECTANT MOTHER CARE
PREGNANCY CENTERS EMC FRONTLINE PREGNANCY CENTER, LIFE
CENTER OF NEW YORK, INC., DBA AAA PREGNANCY PROBLEMS
CENTER, PREGNANCY CARE CENTER OF NEW YORK, INCORPORATED as
CRISIS PREGNANCY CENTER OF NEW YORK, a NEW YORK
NOT-FOR-PROFIT CORPORATION, BORO PREGNANCY COUNSELING
CENTER, a NEW YORK NOT-FOR-PROFIT CORPORATION, GOOD
COUNSEL, INC., a NEW JERSEY NOT-FOR-PROFIT CORPORATION,

*Plaintiffs - Appellees*,


v.


CITY OF NEW YORK, a municipal corporation, MICHAEL BLOOMBERG,
MAYOR OF NEW YORK CITY, in his official capacity, JONATHAN MINTZ, the
COMMISSIONER of the NEW YORK CITY DEPARTMENT OF CONSUMER
AFFAIRS, in his official capacity,

*Defendants - Appellants.*

_____


Before: POOLER, WESLEY, and LOHIER, *Circuit Judges*.

Appeal from the July 13, 2011 memorandum and order of the United States District Court for the Southern District of New York (William H. Pauley III, *J.*) granting Plaintiffs-Appellees' motion for a preliminary injunction enjoining Local Law No. 17, which requires pregnancy services centers, a term defined in the law, to make disclosures regarding the services that they provide. Because the district court found that Plaintiffs had demonstrated, with respect to their First Amendment claims, both (1) a likelihood of success on the merits and (2) irreparable harm, and it also concluded that the law is unconstitutionally vague, the court enjoined the statute in its entirety. On appeal, we conclude that the law is not impermissibly vague. We also conclude that Plaintiffs failed to demonstrate a likelihood of success on the merits with respect to one challenged disclosure provision, which requires pregnancy services centers to disclose if they have a licensed medical provider on staff, but that plaintiffs have demonstrated a likelihood of success on the merits with respect to other provisions challenged by plaintiffs that require other forms of disclosure and impermissibly compel speech. Because the provisions are severable, however, we sever the enjoined provisions from the rest of Local Law No. 17. Accordingly,

2

the memorandum and order of the district court is AFFIRMED in part and

VACATED in part, and this case is REMANDED for further proceedings.

Judge Wesley concurs in part and dissents in part in a separate opinion.

_____

MORDECAI NEWMAN, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel, Larry A. Sonnenshein, Nicholas Ciappetta, Robin Binder, of Counsel, *on the brief*), City of New York, New York, NY, *for Defendants-Appellants*.

JAMES MATTHEW HENDERSON, American Center for Law & Justice, Washington, DC (Cecilia, N. Heil, Erik M. Zimmerman, Carly F. Gammil, *on the brief*), *for Plaintiffs-Appellees the Evergreen Association Inc. and Life Center of New York, Inc.*

MATTHEW BOWMAN, Alliance Defense Fund, Washington, DC (M. Todd Parker, Moskowitz & Book, New York, NY, *on the brief*), *for Plaintiffs-Appellees Pregnancy Care Center of New York, Boro Pregnancy Counseling Center, and Good Counsel, Inc.*

Kimberly A. Parker, Zaid A. Zaid, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, *for amici curiae Planned Parenthood of New York City, NARAL Pro-Choice New York, NARAL Pro-Choice America, Community Healthcare Network, Law Students for Reproductive Justice, New York Abortion Access Fund, New York City Chapter of the National Organization for Women, New York County Chapter of the New York State Academy of Family Physicians, New York State Association of Licensed*

3

*Midwives, National Abortion Federation, National Advocates for Pregnant Women, National Latina Institute for Reproductive Health, Physicians for Reproductive Choice and Health, Public Health Association of New York, Religious Coalition for Reproductive Choice, Reproductive Health Access Project, Sistersong Women of Color Reproductive Justice Collective, the Honorable (Congresswoman) Carolyn Maloney, in support of Defendants-Appellants.*

Brian J. Kreiswirth, Chair, Committee on Civil Rights, The Association of the Bar of the City of New York, New York, NY, *for amicus curiae The Association of the Bar of the City of New York, in support of Defendants-Appellants.*

Priscilla J. Smith, Jennifer Keighley, The Information Society Project at Yale Law School, Brooklyn, NY, *amicus curiae, in support of Defendants-Appellants.*

Melissa Goodman, Alexis Karteron, Arthur N. Eisenberg, New York Civil Liberties Union, New York, NY, *amicus curiae, in support of Defendants-Appellants.*

Dennis J. Herrera, City Attorney, Danny Chou, Chief of Complex & Special Litigation, Erin Bernstein, Deputy City Attorney, San Francisco, CA, *for amici curiae City and County of San Francisco, in support of Defendants-Appellants.*

Deborah J. Dewart, Justice and Freedom Fund, Swansboro, NC, *amicus curiae, in support of Plaintiffs-Appellees.*

Mailee R. Smith, Americans United for Life, Washington, DC, *for amici curiae Pregnancy Care*

4

*Organizations Care Net, Heartbeat International, Inc., and National Institute of Family and Life Advocates, in support of Plaintiffs-Appellees.*

Noel J. Francisco, Jones Day, Washington, DC, *for amicus curiae Law Professors In Support of Appellees, in support of Plaintiffs-Appellees.*

Samuel B. Casey, David B. Waxman, Jubilee Campaign-Law of Life Project, Washington, DC, *for amici curiae, American Association of Pro-Life Obstetricians and Gynecologists, The Catholic Medical Association, and The Christian Medical and Dental Associations, in support of Plaintiffs-Appellees.*

John P. Margand, Scarsdale NY, *for amicus curiae Dr. Michael J. New, in support of Plaintiffs-Appellees.*

Pooler, *Circuit Judge*:

Defendants-Appellants (collectively, "the City") appeal from the July 13, 2011 memorandum and order of the United States District Court for the Southern District of New York (William H. Pauley III, *J.*) granting Plaintiffs-Appellees' ("Plaintiffs'") motion for a preliminary injunction enjoining Local Law No. 17 of the City of New York ("Local Law 17"). Local Law 17, *inter alia*, requires pregnancy services centers, a term defined in the statute, to make certain disclosures regarding the services that the centers provide. *See Evergreen Ass'n, Inc. v. City of New York*, 801 F. Supp. 2d 197, 200-01 (S.D.N.Y. 2011). The district

court found that Plaintiffs, providers of various pregnancy-related services, demonstrated, with respect to their First Amendment claims, both (1) a likelihood of success on the merits and (2) irreparable harm. *See id.* at 202-09; *see also Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011) (discussing standard for preliminary injunction), *aff'd* 133 S. Ct. 2321 (2013). The district court also concluded that Local Law 17 is unconstitutionally vague. It therefore enjoined the statute in its entirety. On appeal, we conclude that the law is not impermissibly vague. We also conclude that Plaintiffs failed to demonstrate a likelihood of success on the merits with respect to one of the challenged disclosures, which requires pregnancy services centers to disclose if they have a licensed medical provider on staff, but that Plaintiffs have demonstrated a likelihood of success on the merits with respect to other provisions challenged by Plaintiffs that require other forms of disclosure and impermissibly compel speech. Because the provisions are severable, we sever the enjoined provisions from the rest of Local Law 17. Accordingly, the memorandum and order of the district court is AFFIRMED in part and VACATED in part, and this case is REMANDED for further proceedings.

6

# BACKGROUND

This case asks us to decide whether the New York City Council and Mayor of New York City can impose requirements on pregnancy services centers aimed at informing potential clients about the centers and the services that they provide, or do not provide, without running afoul of the First Amendment.[1]

## I. Local Law 17

In March 2011, the New York City Council passed and Mayor Michael Bloomberg signed into law Local Law 17, which was scheduled to go into effect on July 14, 2011, and intended to be codified in the New York City Administrative Code ("Administrative Code").[2] The law imposes on pregnancy services centers certain confidentiality requirements and mandatory disclosures. Only the disclosures are at issue in this case. Under the law, pregnancy services centers must disclose

---

[1] We pause to note that Fourth Circuit has recently resolved appeals on a similar issue. *See Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) (after rehearing *en banc*, affirming the district court decision preliminarily enjoining only one of the two challenged disclosures); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264 (4th Cir. 2013) (after rehearing *en banc*, vacating the district court's grant of plaintiffs' motion for summary judgment on their First Amendment challenge).

[2] Citations to the Administrative Code are to Local Law 17's additions to Chapter 5 of Title 20 of the Code, listed in Local Law 17 § 2.

(1) whether or not they "have a licensed medical provider on staff who provides or directly supervises the provision of all of the services at such pregnancy service center" (the "Status Disclosure");

(2) "that the New York City Department of Health and Mental Hygiene encourages women who are or who may be pregnant to consult with a licensed provider" (the "Government Message"); and

(3) whether or not they "provide or provide referrals for abortion," "emergency contraception," or "prenatal care" (the "Services Disclosure").

Administrative Code § 20-816(a)-(e). They must provide the required disclosures at their entrances and waiting rooms, on advertisements, and during telephone conversations.[3] *Id.* § 20-816(f). The law imposes civil fines on facilities that

_____

[3] Specifically, the statute provides that pregnancy services centers must provide the disclosures

(1) in writing, in English and Spanish in a size and style as determined in accordance with rules promulgated by the commissioner on (i) at least one sign conspicuously posted in the entrance of the pregnancy services center; (ii) at least one additional sign posted in any area where clients wait to receive services; and (iii) in any advertisement promoting the services of such pregnancy services center in clear and prominent letter type and in a size and style to be determined in accordance with rules promulgated by the commissioner; and

(2) orally, whether by in person or telephone communication, upon a client or prospective client request for any of the following services:

8

violate its provisions, and it gives the Commissioner of Consumer Affairs the authority to enforce the disclosure requirements by sealing for up to five days any facility that has three or more violations within two years. *Id.* § 20-818(a)-(b).

Local Law 17 defines a "pregnancy services center" as a "facility, . . . the primary purpose of which is to provide services to women who are or may be pregnant, that either (1) offers obstetric ultrasounds, obstetric sonograms or prenatal care; or (2) has the appearance of a licensed medical facility." *Id.* § 20-815(g). The law provides a nonexclusive list of factors for consideration in determining whether a facility "has the appearance of licensed medical facility."[4]

-------------------

(i) abortion; (ii) emergency contraception; or (iii) prenatal care. Administrative Code § 20-816(f).

[4] Local Law 17 states that

[a]mong the factors that shall be considered in determining whether a facility has the appearance of a licensed medical facility are the following: the pregnancy services center (a) offers pregnancy testing and/or pregnancy diagnosis; (b) has staff or volunteers who wear medical attire or uniforms; (c) contains one or more examination tables; (d) contains a private or semi-private room or area containing medical supplies and/or medical instruments; (e) has staff or volunteers who collect health insurance information from clients; and (f) is located on the same premises as a licensed medical facility

*Id.* It is "prima facie evidence that a facility has the appearance of a licensed medical facility if it has two or more of the factors." *Id.* Finally, the law exempts from its provisions facilities that are "licensed . . . to provide medical or pharmaceutical services" or have a licensed medical provider on staff. *Id.*

## II. New York City Council Proceedings

On October 13, 2010 New York City Council Member Jessica S. Lappin introduced the bill that would become Local Law 17, Council Int. No. 371-2010 ("Int. No. 371"), in order to regulate the practices of "crisis pregnancy centers" ("CPCs"), organizations that provide non-medical pregnancy services and are opposed to abortion. The Council's Committee on Women's Issues held a hearing on the bill on November 16, 2010. At the beginning of the hearing, Council Member Julissa Ferreras, as chair of the Committee, testified that the proposed disclosures were required because "[i]f such disclosures are not made, women seeking reproductive health care may be confused and/or misle[]d by unclear advertising or may unnecessarily delay prenatal care or abortion." Council Member Lappin stated that Int. No. 371 was "about truth in advertising

_____

or provider or shares facility space with a licensed medical provider. Administrative Code § 20-815(g).

10

and women's health."  The Committee then considered testimony and written submissions both in favor of and against the bill.

The Committee considered a wide array of testimony in favor of Int. No. 371's proposed disclosure requirements.  Several people testified as to misleading practices by CPCs.  Joan Malin, President and CEO of Planned Parenthood, testified that CPCs are often intentionally located in proximity to Planned Parenthood facilities and that they often use misleading names and signage.  Mariana Banzil, the Executive Director at Dr. Emily Women's Health Center, testified about a particular CPC that would park a bus in front of her clinic, from which the CPC's counselors, often wearing scrubs, would offer ultrasounds, harass Center patients, tell patients that the Center was closed, or identify themselves as Center workers.

Dr. Susan Blank, an Assistant Commissioner at the New York City Department of Health and Mental Hygiene, testified that delay in prenatal care decreases "the likelihood of a healthy pregnancy, delivery, healthy newborn and mother.  That's why starting prenatal care in the first trimester is standard care in obstetric practice."  She also noted the dangers of delays in access to abortion services and emergency contraception.

11

Other witnesses testified to patient experiences with both misleading CPC practices and delays in access to services. Balin Anderson, a social worker at Planned Parenthood, described several of her patients who mistook a CPC for a Planned Parenthood site; one patient was intercepted by a CPC member who posed as a Planned Parenthood staff member. Reverend Matthew Westfox, an ordained minister at the United Church of Christ, described the experience of several parishioners. One woman scheduled an appointment for an abortion at an organization that, as she learned upon arrival, was a CPC. Another

> works at a grocery store and had to negotiate with both her boss and one of her co-workers to get the day off so she could go to the clinic and have the abortion that she and her husband had together decided was best.

> When she realized she had gone to a place that wasn't going to provide the service she needed, that she had wasted her day off, lost the income she could have had that day working, and that it would be without purpose, and that it might be three weeks before she could get another day off to try this again, she was outraged.

Dr. Anne R. Davis described how one of her patients, Susan, went to a CPC during her second trimester in order to get an abortion. Despite there being no medical need, the CPC told the patient that she would need repeated ultrasounds before the procedure could be done:

The staff told Susan that she needed an ultrasound before the procedure. Then another ultrasound. They attributed the multiple tests to uncertainty about how advanced her pregnancy was. Because of these delays, Susan's pregnancy progressed into the third trimester.

Susan was 32 weeks pregnant and still seeking an abortion when she consulted me at our hospital-based clinic. I had to tell her it was no longer possible: she was beyond the legal limit for abortion in New York . . . . [W]hen I examined Susan, I found her case straightforward—one simple abdominal ultrasound would have dated her pregnancy easily. The CPC had no medical reasons for keeping her waiting.

Jennifer Carnig, Director of Communications for the New York Civil Liberties Union, discussed her personal experience mistakenly entering a CPC: she filled out medical history paperwork, gave contact information, and received a pregnancy test and sonogram from a woman wearing medical scrubs. Kristan Toth, an abortion counselor, offered written testimony that "some [of her clients] are set up for procedures with appointments, only to have these appointments canceled and rescheduled time and time again, in an attempt to prolong the process past a point when a woman can have access to a real and safe abortion . . . ." Reverend Dr. Earl Kooperkamp offered written testimony that he had counseled women who had sought advice from CPCs that were unable to discuss with them the full range of pregnancy options. Kellin Conlin, President

13

of NARAL Pro-Choice New York, testified and offered into the record a copy of a NARAL Report. The report, entitled "She Said Abortion Causes Breast Cancer: A Report on the Lies, Manipulations and Privacy Violations at Crisis Pregnancy Centers," summarizes the findings of NARAL's investigation into CPCs through website analysis, phone survey, in-person visits, and review of literature distributed by CPCs. The report describes how many CPCs use medical sounding names, are located near medical clinics and hospitals, provide pregnancy testing and ultrasounds, and require patients to fill out detailed forms soliciting personal information, all of which creates the impression that the CPCs are medical facilities. Several counselors NARAL spoke with gave incorrect information as to how long a woman can legally wait before getting an abortion.

Finally, the Committee also heard testimony as to how many CPCs solicited confidential medical history information from clients.

Testimony was also offered against Int. No. 317. Chris Slattery, the founder of Expectant Mother Care ("EMC"), an anti-abortion pregnancy clinic, testified to the work done by EMC in counseling and providing care to women. He conceded that, at times, women confused EMC with a Planned Parenthood site located in the same building, but noted that EMC did not mislead

14

prospective clients about the fact that EMC was a different organization.

Kathleen Dooley-Polcha, director of the Catholic Guardian Society and Home

Bureaus Maternity Services Program, testified that her organization informed

prospective clients that they did not provide medical care or access to abortion,

but believed that centers should not be required to post disclosure signs.  Persons

affiliated with other CPCs testified about the work they did counseling and

helping women; several noted that their organizations clearly informed women

that they do not provide abortion or medical care.  Dr. Anne Mielnik, a physician,

testified that CPCs play a vital role in helping women.  She noted that she

consulted with several centers to answer medical questions and provide urgent

medical care.  Others testified to First Amendment concerns.  Finally, many

people testified in favor of the services provided by many CPCs, offered concerns

about the potential health risks of abortion, and were worried that the bill would

promote a pro-abortion agenda.

On March 1, 2011, the Committee on Women's Issues approved Int. No.

371, and on March 2, 2011, the full New York City Council passed the bill.  On

March 16, 2011, Mayor Michael Bloomberg signed the bill into law.

Local Law 17 includes a statement of "[l]egislative findings and intent."

Local Law 17 § 1. The New York City Council found that some pregnancy

services centers engaged in deceptive practices about their services; that these

deceptive practices could impede or delay consumer access to reproductive

health services and wrongly lead consumers to believe they had received care

from a licensed medical provider; and that existing laws did not adequately

protect consumers from these deceptive practices. *Id.* It further found that

"[d]elay in accessing abortion or emergency contraception creates increased

health risks and financial burdens, and may eliminate a women's [sic] ability to

obtain [reproductive health services], severely limiting her reproductive health

options." *Id.* The Council stated that it enacted the law to ensure that

"consumers in New York City have access to comprehensive information about

and timely access to all types of reproductive health services including, but not

limited to, accurate pregnancy diagnosis, prenatal care, emergency contraception

and abortion." *Id.*

### III. The Plaintiffs

Plaintiffs The Evergreen Association, Inc. ("Evergreen"), Life Center of

New York ("Life Center"), Pregnancy Care Center of New York ("PCCNY"), Boro

16

Pregnancy Counseling Center ("Boro"), and Good Counsel, Inc. ("Good Counsel") are pregnancy services centers under Local Law 17. Evergreen and Life Center provide a variety of pregnancy-related services including pregnancy testing, pregnancy counseling, ultrasounds, and sonograms. PCCNY, Boro, and Good Counsel also provide pregnancy services, but do not provide ultrasounds, sonograms, or physical examinations. Plaintiffs, with the exception of Good Counsel, provide their services free of charge. Good Counsel, which offers services to pregnant women housed at its residential facilities, asks residents to pass on their rent subsidy (if on public assistance) or 10% of their income (if employed). None of the Plaintiffs offer or provide referrals for abortion or emergency contraception.

Plaintiffs moved for a preliminary injunction to prevent Local Law 17 from taking effect. They argued that the law infringed on their free speech rights under the First Amendment. In a June 13, 2011 memorandum and order, the district court granted the motion. *Evergreen Ass'n, Inc.*, 801 F. Supp. 2d at 197. Defendants the City of New York; Michael Bloomberg, Mayor of New York City, in his official capacity; and Jonathan Mintz, the Commissioner of the New York City Department of Consumer Affairs, in his official capacity, now appeal.

17

## DISCUSSION

Local Law 17 requires pregnancy services centers to disclose (1) whether or not they have a licensed medical provider on staff (the "Status Disclosure"); (2) that "the New York City Department of Health and Mental Hygiene encourages women who are or who may be pregnant to consult with a licensed provider" (the "Government Message"); and (3) whether or not they provide or provide referrals for abortion, emergency contraception, or prenatal care (the "Services Disclosure"). Administrative Code § 20-816(a)-(e). The district court found that these disclosure requirements violated Plaintiffs' First Amendment rights, granted Plaintiffs' motion for a preliminary injunction, and enjoined the law in its entirety.

"We review the grant of a preliminary injunction for abuse of discretion." *Alliance*, 651 F.3d at 230. "A district court abuses its discretion when (1) its decision rests on an error of law or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Id.* (internal quotation marks and ellipsis omitted).

18

Our review of the district court's decision requires us to consider the appropriate level of scrutiny to apply to the law, whether Plaintiffs have met their burden for a preliminary injunction, and whether we must enjoin the statute in its entirety due to vagueness. As discussed below, we find that Local Law 17 is not impermissibly vague, and thus sever the enjoined provisions from the rest of the law. We also find that Plaintiffs failed to demonstrate a likelihood of success on the merits with respect to one of the challenged disclosures.

## I. Severance and Vagueness

Local Law 17 imposes confidentiality requirements that Plaintiffs have not challenged, along with several disclosure requirements and definitional provisions that Plaintiffs have challenged but that might be severable in the event they are unconstitutional. We must, therefore, decide whether to sever any offending provisions or enjoin the law in its entirety. We hold that any offending provisions of the statute that infringe on Plaintiffs' First Amendment rights should be severed from the rest of the statute.

Severance of a local law is a question of state law. *See Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996). "Under New York Law, a court should refrain from invalidating an entire statute when only

19

portions of it are objectionable." *Id.* (internal quotations omitted). "The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether." *Id.* at 73. Here, Local Law 17 provides that

> [i]f any section, subsection, sentence, clause, phrase or other portion of this local law is, for any reason, declared unconstitutional or invalid, in whole or in part, by any court of competent jurisdiction, such portion shall be deemed severable, and such unconstitutionality or invalidity shall not affect the validity of the remaining portions of this local law, which remaining portions shall continue in full force and effect.

Local Law 17 § 3. "Although the presence of a severability clause is not dispositive, the preference for severance is particularly strong when the law contains a severability clause." *Gary D. Peake*, 93 F.3d at 72 (internal quotation marks and brackets omitted). Here, we consider the severability clause along with the City Council's interest in providing consumer access to information and the prevention of deception, *see* Local Law 17 § 1, as well as the statute's confidentiality provisions, enacted to protect consumers' personal and health information, which function independent of the disclosure requirements, *see* Administrative Code § 20-817. We think it clear that the City Council would wish for severance.

20

This does not end our analysis because Plaintiffs argue, and the district court held, that Local Law 17's definition of the term "pregnancy services centers" is impermissibly vague and that, for this reason, the entire statute should be enjoined. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000).

Local Law 17 has two definitions for "pregnancy services centers." The first definition includes facilities that, like Plaintiffs Evergreen and Life Center, provide ultrasounds, sonograms, or prenatal care. Administrative Code § 20-815(g).[5] The second definition includes other facilities, that, like Plaintiffs PCCNY, Boro, and Good Counsel, do not provide such services, but that have "the appearance of a licensed medical facility." *Id.* With regard to this second definition, the law provides that

---

[5] The parties do not seriously argue that this first definition is vague as applied to entities like Evergreen and Life Center, which indisputably provide at least some of the services specified in the statute. For this reason, even if the dissent were right that the second definition is impermissibly vague as applied to the PCCNY Plaintiffs, *see* Dissent at **[3 n.1]**, this would not necessarily require striking the entire statute as opposed to merely that second definition.

> [a]mong the factors that shall be considered in determining whether a facility has the appearance of a licensed medical facility are the following: the pregnancy services center (a) offers pregnancy testing and/or pregnancy diagnosis; (b) has staff or volunteers who wear medical attire or uniforms; (c) contains one or more examination tables; (d) contains a private or semi-private room or area containing medical supplies and/or medical instruments; (e) has staff or volunteers who collect health insurance information from clients; and (f) is located on the same premises as a licensed medical facility or provider or shares facility space with a licensed medical provider.

*Id.* (emphasis added). The law adds that it is "prima facie evidence that a facility has the appearance of a licensed medical facility if it has two or more of the factors." *Id.* Plaintiffs argue that, because this list of factors is nonexclusive, Local Law 17 both fails to give fair notice to regulated facilities and authorizes discriminatory enforcement. The district court, accepting this second argument, found the statute to be vague and enjoined it in its entirety.

We disagree. It is significant that the determination of Local Law 17's applicability is not solely by reference to the aforementioned factors. Instead, the determination is bound by the requirement of an "appearance" of a "licensed medical facility." The listed factors, while nonexclusive, are "objective criteria" that cabin the definition of "appearance." *See United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992) ("These guidelines tend to minimize the likelihood

22

of arbitrary enforcement by providing objective criteria against which to measure possible violations of the law."), *abrogated on other grounds by Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 518-19, 524 n.13 (1994).  In this way, the statute differs from the nonexclusive factors at issue in *Amidon v. Student Association of State University of New York*, which were the *sole* criteria guiding application of the referenda at issue and which included individual factors that were themselves "vague and pliable."  508 F.3d 94, 104 (2d Cir. 2007).  The requirement of an "appearance of a licensed medical facility," combined with the listed factors, is enough to give notice to regulated facilities and curtail arbitrary enforcement.

The use of nonexclusive factors is admittedly imprecise, but the "prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision."  *Rose v. Locke*, 423 U.S. 48, 49 (1975).  "Many statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties."  *Id.* at 49-50 (internal quotation marks and alterations omitted).

Because the New York City Council "would have wished the statute to be enforced with the invalid part exscinded," *Gary D. Peake*, 93 F.3d at 73, and

23

because we find that Local Law 17 is not unconstitutionally vague, we enjoin only the portions of the law that infringe on Plaintiffs' First Amendment rights.

## II. Appropriate Level of Scrutiny

The parties disagree about the appropriate level of scrutiny to apply to Local Law 17. Both agree that the law compels speech. Plaintiffs urge us to apply strict scrutiny. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). "We therefore consider [laws mandating speech]" to be "content-based regulations" subject to strict or exacting scrutiny. *Id.*; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as laws that "suppress, disadvantage, or impose differential burdens upon speech because of its content.").

There are exceptions to this general rule, and the City and its amici put forth a number of arguments as to why we should subject Local Law 17's compelled disclosures to a lesser level of scrutiny. First, they point out that a lesser degree of scrutiny applies to compelled disclosures in the context of campaign finance regulation, *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010),

the regulation of licensed physicians, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992), and commercial speech, *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 650-51 (1985). From this, they argue that the distinction between prohibitions on speech and disclosure requirements should be "pertinent to our analysis," and that we should review Local Law 17 under intermediate exacting scrutiny. *Doe v. Reed*, 561 U.S. 186, 130 S. Ct. 2811, 2818 (2010). Second, they argue that the state's authority to compel physicians to provide information about abortion, *see Gonzales v. Carhart*, 550 U.S. 124, 157 (2007); *Casey*, 505 U.S. at 884, also applies to the regulation of non-licensed individuals who provide pregnancy-related services. Finally, the City argues that Local Law 17 regulates commercial speech, subject to either intermediate scrutiny, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 560, 563-66 (1980), or, if the law compels disclosure of "purely factual and uncontroversial information," rational basis review, *Zauderer*, 471 U.S. at 651.

The district court considered and rejected all of these arguments. We find, however, that we need not decide the issue, because our conclusions are the same under either intermediate scrutiny (which looks to whether a law is no more

extensive than necessary to serve a substantial governmental interest) or strict scrutiny (which looks to whether a law is narrowly drawn to serve a compelling governmental interest).[6]  As discussed below, under either level of review, the Government Message and Services Disclosure fail review while the Status Disclosure survives.

## III.  Preliminary Injunction

A party seeking "to stay government action taken in the public interest pursuant to a statutory or regulatory scheme . . . must establish (1) a likelihood of success on the merits, and (2) irreparable harm in the absence of an injunction." *Alliance*, 651 F.3d at 230 (internal quotation marks and alterations omitted).  In considering the likelihood of success on the merits, we evaluate Plaintiffs' First Amendment claims, considering both the importance of the City's interest and

---

[6] Assuming *arguendo* that Local Law 17's required disclosures regulate commercial speech, we do not believe that the law regulates "purely factual and uncontroversial information," such that rational basis review would apply. *Zauderer*, 471 U.S. at 651.  Neither the Government Message nor the Services Disclosure require disclosure of "uncontroversial" information. The Government Message requires pregnancy services centers to state the City's preferred message, while the Services Disclosure requires centers to mention controversial services that some pregnancy services centers, such as Plaintiffs in this case, oppose.  With respect to the Status Disclosure, the level of review does not matter, because, as discussed below, it survives under even strict scrutiny.

the burden imposed by the regulation in question. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *Cent. Hudson*, 447 U.S. at 566.

Turning to the case at hand, we hold that the district court correctly determined that Plaintiffs have established irreparable harm. "Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003). "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795. Local Law 17, as it compels Plaintiffs to make disclosures or face penalties, is clearly a direct limitation on speech that creates a presumption of irreparable harm.

With respect to the merits, we hold that the City's interest in passing Local Law 17 is compelling. The City has stated that it enacted the statute to inform consumers about the services they will receive from pregnancy services centers in order to prevent delays in access to reproductive health services. *See* Local Law 17 § 1. The City considered a wide variety of testimony related to these interests, including testimony and reports from medical professionals, social workers, clergy, and reproductive health workers about misleading practices, patient

27

experiences, and the dangers of delay in access to reproductive care. "[T]he State has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 767 (1994); *see also Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995) ("[P]rotect[ing] public health by promoting unobstructed access to reproductive health facilities" "serves sufficiently compelling governmental interests.").

At issue in this case is whether the required disclosures are sufficiently tailored to the City's interests. We evaluate the required disclosures individually, beginning with the Status Disclosure.

**A. Status Disclosure**

The Status Disclosure requires pregnancy services centers to disclose whether or not they "have a licensed medical provider on staff who provides or directly supervises the provision of all of the services at such pregnancy services center." Administrative Code § 20-816(b). We disagree with the district court and hold that the Status Disclosure survives review under strict scrutiny.

Under strict scrutiny, the challenged regulation "must be narrowly tailored to promote a compelling Government interest." *Playboy Entm't*, 529 U.S. at 813.

28

The statute must use the least restrictive means to achieve its ends. *Id.* While this is a heavy burden, it is not true "that strict scrutiny is strict in theory, but fatal in fact." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) (internal quotation marks omitted). In First Amendment challenges, regulations have survived strict scrutiny. In *Burson v. Freeman*, for example, the Supreme Court employed strict scrutiny in evaluating a statute carving out a "campaign-free zone" outside polling places. 504 U.S. 191, 193-94 (1992). Balancing the "minor" limitation prescribed by the statute against the historical concerns with voter intimidation and election fraud, the Court held that the statute was narrowly tailored to the state's interest in protecting the right of citizens to vote and conducting reliable elections. *Id.* at 198-210. In *Riley*, the Supreme Court suggested that a requirement that solicitors disclose their professional status would be narrowly tailored to the state's interest in "informing donors how the money they contribute is spent in order to dispel the alleged misperception that the money they give to professional fundraisers goes in greater-than-actual proportion to benefit charity." 487 U.S. at 798; *see also id.* at 799 n.11. The First Amendment test is concerned with a *balancing* of interests. Here, striking down the Status Disclosure would deprive the City of its ability to protect the health of its citizens and combat consumer deception in even the most minimal way.

The Status Disclosure is the least restrictive means to ensure that a woman

is aware of whether or not a *particular* pregnancy services center has a licensed

medical provider at the time that she first interacts with it.  Such a law is required

to ensure that women have prompt access to the type of care they seek.  Plaintiffs

have suggested, and the district court held, that alternative means exist: the City

could sponsor advertisements or post signs outside of pregnancy services

centers; it could prosecute fraud, false advertising, and the unauthorized practice

of medicine under current law; and it could impose licensing requirements on

ultrasound professionals.[7]  *See Evergreen*, 801 F. Supp. 2d at 208-09.  But these

alternate means will not accomplish the City's compelling interest.  City-

sponsored advertisements and signs cannot alert consumers as to whether a

*particular* pregnancy services center employs a licensed medical provider,

because, among other things, this is discrete factual information known only to

the particular center.  Enforcement of fraud or other laws occurs only after the

fact, at which point the reproductive service sought may be ineffectual or

---

[7] As the district court noted, New York state does not impose licensing requirements on ultrasound technicians.  *Evergreen*, 801 F. Supp. 2d at 209.  The district court suggested that the City could impose licensing requirements or lobby the state to do so.  *Id.*

unobtainable.  Finally, the licensing and regulation of ultrasound professionals will not alert consumers to the status of the place in which such professionals are employed unless the licensing and regulation scheme itself requires disclosures comparable to Local Law 17's Status and Service Disclosures.  Moreover, not all regulated centers provide ultrasounds, so a licensing and regulation effort aimed only at those centers that *do* provide ultrasounds would not help patients seeking medical assistance at other centers.  The Status Disclosure is the least restrictive means of providing ready information about pregnancy services centers to consumers.

Similarly, Local Law 17 is not overly broad.  "In order to narrowly tailor a law to address a problem, the government must curtail speech only to the degree necessary to meet the particular problem at hand, and the government must avoid infringing on speech that does not pose the danger that has prompted regulation."  *Green Party of Conn. v. Garfield*, 616 F.3d 189, 209 (2d Cir. 2010).  The district court held that the statute was overinclusive because not all pregnancy services centers engage in deception.  We acknowledge that this is so.  However, while the City considered deception by certain CPCs in its hearing, the problem it sought to solve is a different one.  Local Law 17 seeks to prevent woman from

31

mistakenly concluding that pregnancy services centers, which look like medical

facilities, are medical facilities, whether or not the centers engage in deception.

The law thus applies to facilities that "have the appearance of a licensed medical

facility."

We conclude that the requirement that pregnancy services centers disclose

whether or not they employ medical professionals is narrowly tailored. Our

holding finds support in the Supreme Court's decision in *Riley*, where, as

mentioned above, the Court suggested that a requirement that solicitors disclose

their professional status is "a narrowly tailored requirement [that] would

withstand First Amendment scrutiny." 487 U.S. at 799 n.11.[8] The Supreme Court

has subsequently favorably cited to *Riley*. *See, e.g.*, *Illinois ex rel. Madigan v.*

*Telemarketing Assocs., Inc.*, 538 U.S. 600, 623 (2003); *Int'l Soc'y for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 706-07 (1992) (Kennedy, *J.*, concurring).

Other Circuits have relied on *Riley* to uphold disclosure laws requiring solicitors

---

[8] We note that the plaintiffs in *Riley* did not challenge the status disclosure requirement, making the Supreme Court's discussion of the requirement dicta. 487 U.S. at 799. Additionally, the Court was divided over this issue. *See id.* at 803 (Scalia, *J.*, concurring in part and concurring in judgment) ("I do not see how requiring the professional solicitor to disclose his professional status is narrowly tailored to prevent fraud.").

to disclose their professional status or the name, identity and tax-exempt status of their organization. *See, e.g., Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 343 (4th Cir. 2005); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1485 (6th Cir. 1995); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1539 (11th Cir. 1993); *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1232 (4th Cir. 1989). We acknowledge that the case at hand is different, because the required disclosure does not arise in the context of charitable solicitation. However, in both contexts the laws in question support the state interest in informing consumers and combating misinformation. A requirement that pregnancy services centers "unambiguously" disclose the "professional status" of their employees, *Riley*, 487 U.S. at 799 n.11, is narrowly tailored to the City's interests.

Finally, we note that the United States District Court for the District of Maryland and the Fourth Circuit recently reached a similar conclusion in *Centro Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456 (D. Md. 2011), *rev'd in part*, 683 F.3d 591 (4th Cir. 2012), *rev'd en banc*, 722 F.3d 184 (4th Cir. 2013). At issue in *Centro Tepeyac* was a statute requiring certain non-medical pregnancy centers to post a sign stating: (1) "the Center does not have a licensed medical professional

33

on staff;" and (2) "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider." 779 F. Supp. 2d at 459 (internal quotation marks omitted). The plaintiffs challenged the ordinance on First Amendment grounds and sought a preliminary injunction. Evaluating under strict scrutiny, the district court refused to enjoin the first required disclosure, noting that

> the record is at least colorable at this stage to suggest that the disclaimer is narrowly tailored to meet the interest: only requiring those [pregnancy clinics] to post a notice that a licensed medical professional is not on staff. It does not require any other specific message and in neutral language states the truth.

*Id.* at 471. After rehearing the appeal *en banc*, the Fourth Circuit affirmed the district court. 722 F.3d at 188-92. As Judge Wilkinson stated in his concurrence in *Centro Tepeyac*:

> [I]n exercising its broad police power to regulate for the health and safety of its citizens, the state must also enjoy some leeway to require the disclosure of the modicum of accurate information that individuals need in order to make especially important medical . . . decisions. . . . [The Status Disclosure] relies on the common-sense notion that pregnant women should at least be aware of the qualifications of those who wish to counsel them regarding what is, among other things, a medical condition.

*Id.* at 193. We similarly conclude that the neutral message required by the Status Disclosure survives strict scrutiny.

34

**B. Services Disclosure**

The Services Disclosure requires pregnancy services centers to disclose whether or not they provide or provide referrals for abortion, emergency contraception, or prenatal care. Administrative Code § 20-816(c)-(e). We hold that the Services Disclosure is not sufficiently tailored to the City's interests under either strict scrutiny or intermediate scrutiny.

Evaluating under strict scrutiny, we apply the same tailoring analysis to the Services Disclosure as we did with respect to the Status Disclosure. As we explained above, requirements that the City sponsor advertisements or post signs, prosecute fraud and false advertising, or impose ultrasound licensing requirements are insufficient to ensure that women are readily aware of whether or not a particular pregnancy services center provides the services sought. However, on this record, the Status Disclosure, by itself, might narrowly satisfy the City's interest, as it alerts consumers to a small bit of accurate information about the *type* of services each center provides—medical or non-medical—even though it does not discuss specific services. *Cf. Centro Tepeyac*, 722 F.3d at 190 (considering whether, in light of ordinance's status disclosure, the city's message that pregnant women should consult with a licensed health care provider was "unneeded speech").

Regardless of whether less restrictive means exist, the Services Disclosure overly burdens Plaintiffs' speech. When evaluating compelled speech, we consider the context in which the speech is made. *Riley*, 487 U.S. at 796-97. Here, the context is a public debate over the morality and efficacy of contraception and abortion, for which many of the facilities regulated by Local Law 17 provide alternatives. "[E]xpression on public issues has always rested on the highest rung on the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (internal quotation marks omitted). "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795. A requirement that pregnancy services centers address abortion, emergency contraception, or prenatal care at the beginning of their contact with potential clients alters the centers' political speech by mandating the manner in which the discussion of these issues begins.

*Riley* is again instructive. In that case, the Supreme Court struck down a state law that required solicitors to disclose to potential donors the percentage of charitable contributions that were turned over to charity. *Id.* In striking down the mandatory disclosure, the Court noted that "if the potential donor is unhappy with the disclosed percentage, the fundraiser will not likely be given a

36

chance to explain the figure; the disclosure will be the last words spoken as the donor closes the door or hangs up the phone." *Id.* at 800.  We face similar concerns here.  The Services Disclosure will change the way in which a pregnancy services center, if it so chooses, discusses the issues of prenatal care, emergency contraception, and abortion.  The centers must be free to formulate their own address.  Because it mandates discussion of controversial political topics, the Services Disclosure differs from the  "brief, bland, and non-pejorative disclosure" required by the Status Disclosure.  *See Telco*, 885 F.2d at 1232.

Finally, we consider whether a different answer would obtain under intermediate scrutiny, which looks to whether the regulation at issue is not more extensive than necessary to serve a substantial governmental interest.  While it is a closer question, we conclude that it would not, considering both the political nature of the speech and the fact that the Status Disclosure provides a more limited alternative regulation.

## C.  The Government Message

Finally, the Government Message requires pregnancy services centers to disclose that "the New York City Department of Health and Mental Hygiene encourages women who are or who may be pregnant to consult with a licensed

provider." Administrative Code § 20-816(a). We also hold that it is insufficiently tailored.

First, less restrictive alternatives exist. As the district court in *Centro Tepeyac* noted, the government interest in ensuring that women do not forego medical treatment "might be satisfied once women were aware that [pregnancy services centers] do not staff a medical professional." 779 F. Supp. 2d at 468; *see also Centro Tepeyac*, 722 F.3d at 190. Second, the Government Message differs from both the Status Disclosure and the Services Disclosure in that the City can communicate this message through an advertising campaign. The City's broad message does not require knowledge of discrete information available only to individual pregnancy services centers.

We are also concerned that this disclosure requires pregnancy services centers to advertise on behalf of the City. It may be the case that most, if not all, pregnancy services centers would agree that pregnant women should see a doctor. That decision, however, as this litigation demonstrates, is a public issue subject to dispute. The Government Message, "mandating that Plaintiffs affirmatively espouse the government's position on a contested public issue," deprives Plaintiffs of their right to communicate freely on matters of public

38

concern. *Alliance*, 651 F.3d at 236 (affirming grant of preliminary injunction enjoining government agencies from requiring non-governmental organizations to explicitly adopt statements opposing prostitution as a condition of receiving government funds). The circumstances here differ from *Alliance* in two key respects: (1) the regulation here does not require the speaker to claim the message as its own, *see id.* at 237, but instead qualifies that it comes from the government; and (2) the regulation here was not enacted as a condition to the receipt of funding. The first distinction is of little concern here, because a law that requires a speaker to advertise on behalf of the government offends the Constitution even if it is clear that the government is the speaker. *See Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (invalidating statute that turned speaker's "private property [into] a 'mobile billboard' for the State's ideological message"). The second distinction further underscores the First Amendment violation. While the government may incidentally encourage certain speech through its power to "[choose] to fund one activity to the exclusion of the other," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), it may not directly "mandat[e] that Plaintiffs affirmatively espouse the government's position on a contested public issue" through regulations, like Local Law 17, that threaten not only to fine or de-fund but also to forcibly shut

39

down non-compliant entities, *Alliance*, 651 F.3d at 236; *see also Turner*, 512 U.S. at 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as laws that "suppress, disadvantage, or impose differential burdens upon speech because of its content.").

Based on the above, we hold that the Government Message is insufficiently tailored to withstand scrutiny.

## CONCLUSION

For the foregoing reasons, the memorandum and order of the district court is AFFIRMED in part and VACATED in part. We REMAND for further proceedings consistent with this opinion.

Wesley, *J.*, concurring in part and dissenting in part:

Local Law 17 is a bureaucrat's dream. It contains a deliberately ambiguous set of standards guiding its application, thereby providing a blank check to New York City officials to harass or threaten legitimate activity. Although I concur with the majority that the Government Message and the Services Disclosure fail under either strict or intermediate scrutiny, I agree with the district court that the entire statute is irredeemably vague with respect to the definition of a pregnancy services center (PSC). I therefore dissent from the Court's conclusion that the Status Disclosure survives our review.

Plaintiffs' briefs, the City's arguments, and the record indicate that plaintiffs have mounted an as-applied, rather than a facial, challenge, and the district court treated it as such. *See Evergreen Ass'n, Inc. v. City of New York*, 801 F. Supp. 2d 197, 205 (S.D.N.Y. 2011). Neither party contends that this is a facial challenge, suggests that Local Law 17 is inapplicable to the plaintiffs, or indicates that additional discovery is required before engaging in an as-applied analysis.

Where, as here, a statute "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir.

1

2006).  As the majority rightly points out, courts may conclude that a law is vague

for either of two independent reasons: if the law fails to provide fair notice to

potentially regulated entities, or if the law "authorizes or even encourages

arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732

(2000).  The second of these reasons, which the Supreme Court recognizes as "the

more important aspect of the vagueness doctrine," *Kolender v. Lawson*, 461 U.S.

352, 358 (1983), mandates that statutes "provide explicit standards for those who

apply them" to avoid "resolution on an ad hoc and subjective basis, with the

attendant dangers of arbitrary and discriminatory application."  *Grayned v. City of

Rockford*, 408 U.S. 104, 108-09 (1972).

No one disputes that Local Law 17 burdens First Amendment expression,

and in my view the law utterly fails to provide adequate guidance for its

enforcement.  The law gives the Commissioner unbridled discretion to determine

that a facility has the "appearance of a licensed medical facility."  This is an

inherently slippery definition – all the more because, as the district court

recognized, the law carries the "fundamental flaw" of enumerating factors that

are only "among" those to be considered, meaning that the City can find a facility

covered absent any *or all* of the listed qualities.  *See Evergreen*, 801 F. Supp. 2d at

2

210.  A facility that meets three of the factors might not be a PSC, whereas a facility meeting only one – or none! – of those factors might still be subjected to the restrictions of the law.[1]

This framework authorizes and encourages arbitrary enforcement.  The law expressly allows the City to decide, without additional direction, what to do with centers that meet only one listed factor.  And even worse, the law explicitly authorizes the City to rely on other, unlisted factors, not known to anyone, which may themselves be vague or discriminate on the basis of viewpoint.  Although counsel for the City sought during oral argument to assure us that *ad hoc* investigative decisions would not occur, such a "trust me" approach to enforcement in serious regulatory matters is small comfort for those being investigated.

The City does not dispute that the Commissioner has broad discretion to determine whether a facility qualifies as a PSC – indeed, they admit that this is *by design*.  According to the City, Local Law 17 "grants the Commssioner appropriate discretion to identify [a PSC] *should there exist circumstances*

---

[1]None of the PCCNY Plaintiffs engage in activities that trigger the "ultrasound/prenatal care" provision of Local Law 17.  *See* Joint App'x 1051.  Thus, they can only be subject to the law if they meet the "appearance of a medical facility" test.

consistent with, but not strictly limited to, the guidelines enumerated."

Appellants' Br. at 84 (emphasis added). As counsel for the City explained during

oral argument before the district court, the definition of a PSC "is meant to cover

anything that comes along in the future. I don't know in particular what falls

within the definition now." Joint App'x 1007. In other words, because the City

cannot anticipate all the facilities that it may want the law to cover, the City

needs the maximum of flexibility to be able to decide whether a facility is a PSC.

But "[i]f the [City] cannot anticipate what will be considered [a PSC under the

statute], then it can hardly expect [anyone else] to do so." *See Fox Television*

*Stations, Inc. v. FCC*, 613 F.3d 317, 331 (2d Cir. 2010), *vacated on other grounds*, 132

S. Ct. 2307 (2012).[2]

The majority's reliance on *United States v. Schneiderman*, 968 F.2d 1564 (2d

Cir. 1992), is misplaced. In that case, we rejected a vagueness challenge to a

statute that prohibited the sale of drug paraphernalia in certain instances. The

statute contained a list of 15 different items that exemplified drug paraphernalia

---

[2]The Supreme Court's vacatur of this decision had no impact on the propositions cited above. The Court determined that the FCC's standards for determining obscene content were vague as applied to the broadcasts in question. It therefore did not address this Court's determination that the statute was unconstitutionally vague on its face. *See Fox Television Stations*, 132 S. Ct. at 2320.

4

but also noted that the statute covered any item "primarily intended or designed for use in ingesting, inhaling, or otherwise introducing" certain controlled substances into the body. *Id.* at 1569. *Schneiderman* recognized that with regard to criminal statutes, a vagueness challenge was on unsteady ground if the statute had a *mens rea* element. Because the statute at issue criminalized conduct when the device in question was "primarily intended or designed" to aid in drug use, the court was confident that defendants selling or transporting implements intended to be used with drugs would have adequate notice that their conduct was prohibited. Moreover, the list of examples of prohibited devices, along with additional factors that could be used to evaluate a particular device, adequately circumscribed the statute. *See id.* *Schneiderman* was not a case in which the standards were ill defined, or in which the statute allowed an enforcing official to determine on an *ad hoc* basis what a device "appeared" to be. Instead, the choices were limited by the *mens rea* element regarding the intended use of the device. That is not the case here.

Local Law 17 also regulates expression, which requires a particularly high degree of specificity. Under the law as written, a facility – whether or not it is anti-abortion – may be subject to the disclosure requirements simply because it is

located in a building that houses a medical clinic, no matter how far it is from that clinic. The operators of such a center have no way of knowing whether the Commissioner will penalize them for failing to comply with the law's requirements even if the center exhibits no other characteristics similar to a medical facility; the context of the law raises the troubling possibility of arbitrarily harsh enforcement against such centers that choose not to tell women about the option of abortion.

It may well be that some PSCs lull pregnant women into making uninformed decisions about their health. The City has an interest in preventing impostors from posing as healthcare workers and in making sure that misinformation is not directed at a vulnerable class of poor or uninformed women. However, the City does not have a right to sweep all those who, for faith-based reasons, think that abortion is not the right choice in with those who would defraud or intentionally mislead women making this important and personal decision. Local Law 17 is unconstitutional to the extent that plaintiffs challenge it in this Court.